UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Chapter 7

Marla T. Woodford,                                        Case No. 14-52306

      Debtor.                                       Hon. Phillip J. Shefferly

_____/

Initial Investments, Inc.,                               Adversary Proceeding
                                                         No. 14-5096-PJS
      Plaintiff,

v.

Marla T. Woodford,

      Defendant.

_____/

### OPINION AFTER TRIAL DISMISSING
### <u>COMPLAINT TO DETERMINE NONDISCHARGEABLE DEBT</u>

### <u>Introduction</u>

      This matter is before the Court on a complaint in a Chapter 7 bankruptcy case to determine

a debt to be nondischargeable under § 523(a)(4) and (a)(6) of the Bankruptcy Code. The plaintiff

is a corporation engaged in providing restoration services for existing structures. The defendant is

an individual who owned a home that suffered water damage and hired the plaintiff to perform

restoration services. The plaintiff claims that the defendant owes a debt for services that it

performed. The plaintiff further claims that the debt is nondischargeable because the defendant's

conduct constitutes defalcation while acting in a fiduciary capacity, embezzlement, larceny, and a

willful and malicious injury to the plaintiff or its property. The defendant denies that she owes any

debt at all to the plaintiff, but even if she does, any outstanding debt is purely a debt from a breach of contract and is not within any exception to her discharge. This opinion constitutes the Court's findings of fact and conclusions of law following trial. For the reasons explained in this opinion, the Court finds that the defendant does owe a debt to the plaintiff, but the debt is not excepted from the discharge in the defendant's Chapter 7 case.

## Jurisdiction

The District Court for the Eastern District of Michigan has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b). Pursuant to 28 U.S.C. § 157(a) and E.D. Mich. LR 83.50(a), the District Court has referred this adversary proceeding to the Bankruptcy Court. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The Court has both the statutory and constitutional authority to adjudicate and enter a final judgment in this adversary proceeding.

## Procedural History

On July 28, 2014, Marla T. Woodford ("Debtor") filed a petition under Chapter 7 of the Bankruptcy Code. On October 20, 2014, Initial Investments, Inc. ("Initial Investments") commenced this adversary proceeding by filing a complaint alleging that it performed restoration services at the Debtor's home pursuant to a contract it entered into with the Debtor. The complaint alleges that the Debtor owes an unpaid balance to Initial Investments in the amount of $34,285.60, plus interest, costs and attorney fees. The complaint further alleges that the Debtor failed to turn over to Initial Investments two checks that were issued by the Debtor's insurance company for work performed by Initial Investments.

Count I of the complaint alleges that the debt is nondischargeable under § 523(a)(4) of the Bankruptcy Code because the Debtor's failure to turn over the insurance checks constitutes fraud

or defalcation while acting in a fiduciary capacity, embezzlement or larceny. Count II of the complaint alleges that the debt is nondischargeable under § 523(a)(6) of the Bankruptcy Code because the Debtor's failure to turn over the insurance checks constitutes a willful and malicious injury to Initial Investments or its property.

After the Debtor filed an answer and affirmative defenses to the complaint, the Court held a scheduling conference and issued a scheduling order with dates for a final pretrial conference and trial. Just prior to the scheduled trial date, the parties negotiated a settlement. Unfortunately, for reasons discussed later in this opinion, the settlement fell apart, and the Court rescheduled the adversary proceeding for trial.

On November 16 and 17, 2016, the Court held the trial. Initial Investments called three witnesses: Carletta Flowers ("Flowers"), the president and owner of Initial Investments; Harold Crittenden ("Crittenden"), a heating and cooling contractor hired by Initial Investments; and Paul Verona ("Verona"), an electrical contractor hired by Initial Investments. The Debtor called two witnesses: herself and Leon Mancour ("Mancour"), a consultant regarding rehabilitation and construction of houses. The Court received into evidence Initial Investments' exhibits 1-3, 5-6, 8-9, 11, 14, 18-19, 21-22, 24, 34, 39-44, 47, 52, 54-56 and 58 (page two only), and the Debtor's exhibits A and C-E. Following the trial, the Court took the matter under advisement.[1]

## Facts

The Court finds the following facts from the record made at the trial.

---

[1] The Court also took under advisement the Debtor's request to admit Debtor's exhibit H, a report prepared by Mancour. The Court now denies that request for reasons that are explained later in this opinion.

-3-

The Debtor and Flowers were long time friends.  When the Debtor's home at 16169 Prest, Detroit, Michigan ("Property") experienced water damage in early 2012, the Debtor hired Flowers' company, Initial Investments, to perform the restoration services.  Initial Investments had been in business since 1999 and Flowers was experienced and knowledgeable about construction, restoration services and insurance.

On April 15, 2012, the Debtor signed a "work authorization" ("Work Authorization") (exhibit 1) on an Initial Investments form.  The Work Authorization stated that Initial Investments would perform restoration services on the Property and that the Debtor would pay for all of the work performed upon receipt of an invoice from Initial Investments.  The Work Authorization contained a place for the Debtor to designate her insurance company.   The Debtor designated "Hanover/Citizens" ("Hanover").  The Work Authorization provided for the Debtor to authorize Hanover "to pay all proceeds due [Initial Investments] payable under our policy directly to [Initial Investments].  If our names are included on the payment, we agree to promptly endorse said payments to [blank] (within 3 days of receipt.)"   The Work Authorization stated that as the owner of the Property, the Debtor would pay for all the work not covered by insurance.  Finally, the Work Authorization provided that "if it becomes necessary for [Initial Investments] to retain counsel" to enforce the Work Authorization, the Debtor will pay Initial Investments' attorney fees and court costs, and that interest shall accrue at the rate of 1-1/2% per month on any unpaid balance beginning 30 days after the Debtor receives a billing statement.

About the time that the parties signed the Work Authorization, Initial Investments prepared an estimate (exhibit 2) of the cost of its restoration services.  The estimate was subsequently revised once the work began.  Initial Investments performed the restoration services on the Property from

-4-

April 15, 2012 through November 28, 2012. In addition to the restoration services covered by the Debtor's insurance, Initial Investments also made a number of upgrades to the Property that were requested by the Debtor but were not covered by her insurance.

The billing paperwork prepared by Initial Investments is confusing to say the least. It appears that Initial Investments had the Debtor sign various papers that were sent by Initial Investments to the City of Detroit, Hanover, and to the company that serviced the Debtor's mortgage on the Property, Seterus, Inc. ("Seterus"). During her testimony, Flowers acknowledged that the paperwork was not altogether consistent, and admitted that even she did not know how to reconcile all the different paperwork that was introduced into evidence, at one point describing it as a "mess."

Although she started out with "complete blind trust" in Initial Investments, the Debtor became dissatisfied with its work and the relationship between the Debtor and Flowers soured. Eventually, there was a complete breakdown in their relationship. However, prior to that breakdown, and regardless of any confusion in the paperwork, it is not disputed that while the work was being performed, some payments were made to Initial Investments by the Debtor for the work not covered by insurance, by Hanover for the work covered by insurance, and by Seterus out of proceeds that it received from Hanover for the work covered by insurance.

Much of the evidence at the trial concerned the payments made by Seterus from proceeds that it received from Hanover. On May 23, 2012, Hanover issued a three party check (exhibit D) in the amount of $45,652.91 payable to the Debtor, Initial Investments and Seterus. The Debtor and Initial Investments both endorsed the check over to Seterus. From there, Seterus made payments to Initial Investments that were basically draws against the $45,652.91 for work as it was being performed. Although the date is not clear in the record, the first of those draws was made in the

amount of $15,217.64, by means of a two party check from Seterus made payable to the Debtor and Initial Investments, which the Debtor endorsed and delivered to Initial Investments. Similarly, a second draw in the amount of $7,608.82 was made in September, 2012 by means of a two party check from Seterus made payable to the Debtor and Initial Investments, which the Debtor again received, endorsed and turned over to Initial Investments. Finally, another draw in the amount of $7,608.82 was made in October, 2012 by means of a two party check from Seterus made payable to the Debtor and Initial Investments, which the Debtor again received, endorsed and turned over to Initial Investments. Out of the $45,652.91 paid by Hanover to Seterus on May 23, 2012, Seterus disbursed a total of $30,435.28 by the end of October, 2012, in the form of three checks, each made payable jointly to the Debtor and Initial Investments, and each of which the Debtor endorsed and delivered to Initial Investments. That left a remaining balance of $15,217.63 held by Seterus out of the $45,652.91 of proceeds that it received from Hanover.

Hanover also made a separate payment for restoration services that did not go to Seterus but instead went directly to the Debtor and Initial Investments. On September 24, 2012, Hanover issued a two party check (exhibit E) in the amount of $10,910.97 made payable jointly to the Debtor and Initial Investments. This check was for work required in bringing the Property up to code and for permit fees. Like the three draws from Seterus, the Debtor received this check, endorsed it and delivered it to Initial Investments.

Apart from the payments made by Hanover or by Seterus out of proceeds from Hanover, the Debtor herself also made payments to Initial Investments totalling $7,500.00.

Although the Debtor endorsed and turned over to Initial Investments four separate checks from Hanover and Seterus, and made payments on her own to Initial Investments, the Debtor was

becoming increasingly dissatisfied with the work that Initial Investments performed. At some point the Debtor decided that she was not going to make any more payments herself, nor endorse any more insurance checks to Initial Investments.

When Initial Investments finished its work on the Property, a final inspection was conducted on November 28, 2012. Notwithstanding the Debtor's dissatisfaction, Initial Investments' work was approved both by the City of Detroit (exhibit 11) and by QBE Inspection ("QBE"), the inspector for Seterus.

On December 4, 2012, Initial Investments sent the Debtor a "Final Invoice" (exhibit C) for $83,131.85, representing the cost of all of its services, including both those that were covered by insurance and all of the upgrades to the Property requested by the Debtor that were not covered by insurance. The Final Invoice stated that there was an "outstanding balance due immediately" of $34,285.60. On December 5, 2012, Initial Investments sent Seterus a "demand for payment in full" (exhibit 52) requesting final payment under the Work Authorization. According to the demand, the outstanding balance of $34,285.60 was made up of: (i) the remaining draw of $15,217.63 still held by Seterus out of the $45,659.91 proceeds it had received from Hanover; (ii) insurance depreciation and deductible of $16,550.97; and (iii) revisions and upgrades of $2,517.00 owed by the Debtor.

Despite the fact that Initial Investments' work had been inspected and approved by both the City of Detroit and by QBE, the Debtor refused to sign the bottom of the Work Authorization acknowledging that the work was completed and approved, refused to endorse and deliver any more checks from Seterus and Hanover, and refused to make any further payments on her own to Initial Investments. The Debtor denied that Initial Investments was owed anything more for the work it had performed on the Property, and drew up a list of complaints (exhibit 41) that she sent to the

State of Michigan, the City of Detroit and Hanover. Further, to rectify what she believed to be problems with the work performed by Initial Investments, the Debtor went out and hired her own contractors to alter some of Initial Investments' work.

On December 20, 2012, Initial Investments filed a claim of lien against the Property. On May 9, 2013, Initial Investments filed a complaint against the Debtor in the Wayne County Circuit Court, case no. 2013-006120-CH ("Wayne County Lawsuit"), alleging breach of contract and seeking foreclosure of the lien. Hanover and Seterus were also named as defendants in the Wayne County Lawsuit. Although the record is silent as to the timing and the circumstances, the Debtor and Flowers agree that the court in the Wayne County Lawsuit eventually ordered Seterus to place on deposit with that court a check in the amount of $15,217.63, and that Seterus complied with the order. The Wayne County Lawsuit was stayed as to the Debtor by the filing of the Debtor's bankruptcy case. Since then, Initial Investments and the Debtor have vigorously litigated this adversary proceeding.[2]

As noted earlier, on the eve of the first trial date in this adversary proceeding, the parties managed to reach a settlement. On October 27, 2015, they filed a stipulation approving a settlement agreement ("Settlement Agreement") (exhibit 56). On October 28, 2015, the Court entered an order ("Order Approving Settlement") approving the Settlement Agreement. The Settlement Agreement recites that the Debtor disputes the amount claimed to be owing by her to Initial Investments. Notwithstanding this dispute, the Settlement Agreement provides that this adversary proceeding will

---

[2] On June 15, 2015, the Court granted Initial Investments' unopposed motion for relief from the automatic stay in the Debtor's Chapter 7 bankruptcy case to permit Initial Investments to take action in the Wayne County Lawsuit to recover any insurance proceeds held by that court.

-8-

be settled and dismissed upon receipt by Initial Investments of two checks. Recital H of the Settlement Agreement begins as follows: "According to Initial Investments, Hanover has issued checks payable to [the Debtor] and Initial Investments . . . ." Recital H then describes two checks as being in the amount of $15,550.97 and $15,217.63, and refers to them collectively as the "Insurance Proceeds." Recital L of the Settlement Agreement states that Hanover is holding $15,550.97 of the Insurance Proceeds ("Hanover Proceeds"), and that the remaining Insurance Proceeds of $15,217.63 are being held in escrow in the Wayne County Lawsuit ("Seterus Proceeds"). Basically, the Settlement Agreement provides that if the Insurance Proceeds – consisting of these two amounts – are delivered to Initial Investments, this adversary proceeding will be dismissed and the Debtor and Initial Investments will mutually release each other, without any further payment by the Debtor and without any further claim by Initial Investments. The Settlement Agreement binds the Debtor and Initial Investments to execute and deliver any documents reasonably necessary in order to effectuate the purposes of the Settlement Agreement.

Because the Settlement Agreement – including the dismissal of the adversary proceeding – was predicated on Initial Investments receiving the Insurance Proceeds, consisting of the two checks described in the Settlement Agreement, the Court adjourned the trial. In the Order Approving Settlement, the Court directed the Debtor and Initial Investments "to take the appropriate steps as expeditiously as possible to cause the Insurance Proceeds to be remitted to Initial Investments." Further, because the Settlement Agreement did not provide for the dismissal of the adversary proceeding until such time as Initial Investments actually received the Insurance Proceeds, the Order Approving Settlement stated that the Court would monitor the progress of the parties in obtaining those proceeds by scheduling a status conference approximately 90 days later, on January 25, 2016.

The Order Approving Settlement provided that the status conference would be cancelled if Initial Investments received the Insurance Proceeds prior to the date of the status conference.

Following entry of the Order Approving Settlement, the parties ran into difficulty obtaining the Seterus Proceeds from the Wayne County Circuit Court. As a result, Initial Investments filed a motion in this Court to assist it in obtaining those funds. Because of the pendency of that motion, the Court adjourned the status conference until March 7, 2016. Fortunately, by the adjourned status conference date, Initial Investments had received word from the Wayne County Circuit Court that it would soon release the Seterus Proceeds to Initial Investments, and it did just that.

Unfortunately, a more serious problem surfaced with respect to the Hanover Proceeds. At the adjourned status conference on March 7, 2016, Initial Investments informed the Court that it had not received the Hanover Proceeds from Hanover. Worse still, Initial Investments informed the Court that it had now learned for the first time that Hanover no longer held the Hanover Proceeds. Because they did not yet know all of the facts regarding what had happened to the Hanover Proceeds, the attorneys for the Debtor and Initial Investments requested that the Court again adjourn the status conference to give them time to further investigate. The Court adjourned the status conference to April 11, 2016.

At the adjourned status conference, Initial Investments told the Court it had now learned that in fact, more than three years earlier, in December, 2012, Hanover had issued a two party check ("Hanover Check") in the amount of $15,550.97, made payable jointly to the Debtor and Initial Investments. Rather than endorsing the Hanover Check and delivering it to Initial Investments when she received it, it turns out that the Debtor had instead returned it to Hanover and somehow got Hanover to issue another check (page 2 of exhibit 58) on April 19, 2013 in the identical amount,

only this time the check was made payable solely to the Debtor, and the Debtor promptly cashed it. As a result, it was now clear that one of the conditions under the Settlement Agreement for dismissal of the adversary proceeding – receipt of the Hanover Proceeds – could not be met.

Initial Investments accused the Debtor of perpetrating a fraud by inducing Initial Investments to enter the Settlement Agreement when she knew all along that the Settlement Agreement could not be performed because the Hanover Check had previously been sent by Hanover to the Debtor, returned by the Debtor to Hanover, and replaced by Hanover with a check made payable solely to the Debtor, that the Debtor had already negotiated. Outraged by these facts, and with the trial of the adversary proceeding having now been delayed for months, Initial Investments requested the Court to reschedule the trial. Because the Settlement Agreement could not be performed without the Hanover Proceeds, the Court agreed that the adversary proceeding would now have to proceed to trial.

Having now fully considered the evidence adduced at trial, the Court finds that Initial Investments did the work that it was hired to do to restore the Property. Flowers testified credibly, supported by extensive documentary evidence, that the work was performed pursuant to the Work Authorization, and that it was approved both by the City of Detroit and by QBE, despite the Debtor's failure in some instances to provide product specifications by required deadlines. The credible testimony of Crittenden and Verona corroborates Flowers' testimony that all of the work that Initial Investments was hired to perform was fully performed.

Although the Debtor testified that Initial Investments did not fully perform all of the work that it had agreed to perform, and that some of the work that it did perform was defective, the Court does not credit that testimony. The Court has no doubt that the Debtor sincerely believes that the

-11-

work was unfinished and deficient. But that does not prove that it was, or that the Debtor's belief is factually accurate.

The only evidence in the record that even arguably supports the Debtor's testimony regarding Initial Investments' work came from Mancour and his report (exhibit H). As noted earlier, the Court took under advisement the question of whether Mancour's report should be admitted into evidence. The Court did so because the parties had agreed during trial to accommodate Mancour's schedule by allowing the Debtor to call Mancour as a witness out of sequence during the presentation of Initial Investments' case in chief. At that time, it was not clear to the Court whether the report would assist the Court, as the trier of fact, to understand and determine any fact at issue in this adversary proceeding. Now that the record is complete, and the Court has had the opportunity to consider the report in the context of the entire record, the Court finds that the report must be excluded from the evidence. The report is based entirely on Mancour's observations about the Property that he made during two inspections, one on December 9, 2013 and the other in July, 2014. Both of these inspections took place more than a year after Initial Investments completed its work. The record shows that by the time of these two inspections, the Debtor had hired her own contractors to work on the Property after Initial Investments was done. As a result, there is no way to tell whether any of Mancour's after-the-fact observations about the Property pertain to work performed by Initial Investments, or by someone else that the Debtor subsequently hired, or were caused by the Debtor's failure to provide timely product specifications. The report does not assist the Court in understanding or determining any facts at issue in this adversary proceeding. Therefore, the Court sustains Initial Investments' objection to its admission. Moreover, to the extent that Mancour testified during trial about Initial Investments' work, the Court gives no weight to such testimony

-12-

because it is directly refuted by the fact that Initial Investments' work was approved upon completion both by the City of Detroit and QBE. The evidence in the record establishes that the Debtor was without factual basis for the complaints that she made.

The Court finds that Initial Investments' work was fully performed pursuant to the Work Authorization and that Initial Investments was owed the sum of $83,131.85 for the work that it performed. Of that amount, the evidence shows that, before the Debtor filed bankruptcy, Initial Investments received the following payments:

> $15,217.64 from Seterus
>
> $7,608.82 from Seterus
>
> $7,608.82 from Seterus
>
> $10,910.97 from Hanover
>
> <u>$7,500.00 from the Debtor</u>
>
> $48,846.25 Total payments received by Initial Investments.

After application of these payments to the invoiced amount, the Court finds that there was an outstanding debt owing by the Debtor to Initial Investments in the amount of $34,285.60 as of the petition date. The Court rejects the defenses asserted by the Debtor that the work was not performed in a workmanlike quality or manner because they are not supported by the evidence. As of the date of the Debtor's Chapter 7 petition, Initial Investments held a valid and enforceable pre-petition claim against the Debtor in the amount of $34,285.60.[3]

Initial Investments' complaint alleges that there were two checks that the Debtor refused to endorse and deliver to Initial Investments – one for the Hanover Proceeds and one for the Seterus

---

[3] This amount consists of $15,550.97 for the Hanover Proceeds; $15,217.63 for the Seterus Proceeds; $2,517.00 for additional upgrades; and $1,000.00 for the Debtor's deductible.

Proceeds. The evidence shows that there was actually only one check (i.e., the Hanover Check) that the Debtor received and refused to endorse or deliver. In contrast to the Hanover Proceeds, the evidence does not show that there was ever a check received by the Debtor for the Seterus Proceeds. The Court infers from the evidence in the record that Seterus did not issue a check for the Seterus Proceeds because the Debtor refused to sign the bottom of the Work Authorization acknowledging that the work was completed and approved. Instead, Seterus held the Seterus Proceeds until it was ordered by the court in the Wayne County Lawsuit to deposit the Seterus Proceeds with that court. Ultimately, despite the Debtor's wrongful refusal to approve the work, Initial Investments has now received the Seterus Proceeds. After application of the Seterus Proceeds of $15,217.63 to its pre-petition claim, Initial Investments is now owed a balance on its claim of $19,067.97, plus attorney fees, costs and interest.

As for the Settlement Agreement, the Court finds from the Debtor's own testimony that she knew at the time she made the Settlement Agreement that Hanover no longer held the Hanover Proceeds. The Debtor knew that she had received the Hanover Check three years earlier, had returned it to Hanover, and somehow convinced Hanover to give her a check made payable only to her, on April 24, 2013, in the identical amount of the Hanover Check.

## Discussion

### Burden of Proof

As the plaintiff, Initial Investments has the burden of proving each of the elements for nondischargeability "by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the [plaintiff]." Rembert v. AT&T Universal Card Services, Inc. (In

re Rembert), 141 F.3d 277, 281 (6th Cir. 1998) (citing in part <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991)) (other citations omitted).

Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." Initial Investments contends that the debt owed to it by the Debtor is nondischargeable under each of these subparts of § 523(a)(4). The Court will deal with them in sequence.

The Sixth Circuit has held that defalcation while acting in a fiduciary capacity for purposes of § 523(a)(4) requires that a plaintiff prove a preexisting fiduciary relationship in the form of an express trust or technical trust, that there has been a breach of that fiduciary relationship and a resulting loss. <u>Patel v. Shamrock Floorcovering Services, Inc.</u> (<u>In re Patel</u>), 565 F.3d 963, 968 (6th Cir. 2009). Further, the Sixth Circuit has explained that to establish the existence of an express trust, the plaintiff "must demonstrate (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." <u>Id.</u> (internal quotation marks and citation omitted).

Initial Investments argues that the Work Authorization constitutes an express trust because it states that the Debtor authorized her insurance company to pay proceeds to Initial Investments and obligates the Debtor to "promptly endorse" to Initial Investments any payments that it receives. The Debtor makes two arguments in response. First, the Debtor points out that the space provided on the Work Authorization to indicate to whom the endorsements should be made was left blank. Second, the Debtor argues that the Work Authorization does not contain sufficient language to establish an express trust as required by the Sixth Circuit.

-15-

The Debtor's first argument is not persuasive. Flowers testified credibly that the space provided on the Work Authorization to indicate the name to whom the endorsements should be made was inadvertently left blank and should have identified Initial Investments. The Debtor did not dispute this explanation during her testimony and there is no other contrary evidence in the record. The Court rejects the Debtor's argument that the inadvertent failure to complete this blank space precludes the Court from finding that the Work Authorization creates a trust.

The Debtor's second argument is more persuasive. The Court agrees that the Work Authorization does not state an intention to create a trust nor does it refer to the Debtor as a trustee. Further, it does not describe any payments received by the Debtor as a trust res and does not designate Initial Investments as a definite beneficiary. To be sure, the Work Authorization expressly obligates the Debtor to pay for the services performed by Initial Investments. And it expressly obligates the Debtor to promptly endorse insurance payments that the Debtor receives for such work over to Initial Investments. The Debtor's failure to perform on those obligations unquestionably breached her contract. But that is all. The Work Authorization lacks the necessary elements to make it an express trust under controlling Sixth Circuit precedent for purposes of § 523(a)(4). Without an express trust, the Debtor did not have a fiduciary relationship to Initial Investments for purposes of § 523(a)(4).

Even if the Court were to accept Initial Investments' characterization of the Work Authorization as a trust, the evidence does not show that there was defalcation by the Debtor. In Bullock v. Bankchampaign, N.A., __ U.S. __, 133 S. Ct. 1754 (2013), the Supreme Court stated that defalcation for purposes of § 523(a)(4) requires an intentional wrong. The Supreme Court explained

that defalcation includes conduct "that the fiduciary knows is improper [and] also reckless conduct of a kind that the criminal law often treats as the equivalent." Id. at 1759.

The crux of Initial Investments' complaint is that the Debtor refused to endorse and deliver what it alleges were two checks, one from Hanover and one from Seterus. As it turns out, the evidence shows that there was only one check that the Debtor actually received: the Hanover Check. There is no evidence that the Debtor received a check from Seterus, let alone that she committed some intentional wrong with respect to any check from Seterus. In any event, and as noted earlier, Initial Investments has now received the Seterus Proceeds from the court in the Wayne County Lawsuit. Therefore, there is no longer any unpaid debt relating to the Seterus Proceeds. Receipt of the Seterus Proceeds by Initial Investments moots any defalcation claim regarding these proceeds. That just leaves Initial Investments' defalcation claim as to the one check that was issued: the Hanover Check.

The Debtor admitted during her testimony, and there is no contrary evidence in the record, that she did not endorse and deliver the Hanover Check to Initial Investments when she received it in late December, 2012. The Debtor explained that the reason that she did not do so was because she did not believe that the work had been performed in a satisfactory manner in compliance with the terms of the Work Authorization. According to the Debtor, Initial Investments was not owed the invoiced amount. The Debtor's testimony that she was dissatisfied is credible and is supported by documentary evidence (exhibit 41). Even Flowers readily acknowledged during her own testimony that the Debtor was dissatisfied. The Court has already found that the Debtor's belief was wrong, and that Initial Investments did the work it agreed to do, the work was fully approved, and the Debtor owed Initial Investments the invoiced amount. But the uncontroverted evidence also

proves that the reason why the Debtor did not endorse and deliver the Hanover Check when she received it was because she held a sincere, albeit incorrect, belief that the money was not owed to Initial Investments.

There is no allegation, nor any evidence, that the Debtor forged Initial Investments' signature or otherwise unlawfully negotiated the Hanover Check. The Debtor's conduct in this case – refusing to pay for what she considered to be subpar work – is simply not the type of intentional or criminal conduct described in Bullock that constitutes defalcation. The Work Authorization does not constitute an express trust, but even if it does, the evidence does not support a finding of defalcation with respect to the Hanover Check.

Nor does the evidence support a finding that the Debtor's conduct constitutes either embezzlement or larceny. "Federal common law defines embezzlement as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has unlawfully come.'" Williams v. Noblit (In re Noblit), 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005) (quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir.1996)). "[E]mbezzlement requires a showing of wrongful intent." Bullock v. Bankchampaign, __ U.S. at __, 133 S. Ct. at 1760 (citing cases requiring a finding of "moral turpitude," "intentional wrong," or "felonious intent").

Initial Investments has now received the Seterus Proceeds, so there is no evidence that the Debtor converted or misappropriated these proceeds to her own use. As for the Hanover Check, the evidence shows that the Debtor returned the Hanover Check to Hanover which then stopped payment on it. The Debtor somehow got Hanover to stop payment on the Hanover Check and to issue another check made payable to her in an identical amount. The Debtor testified that she used

-18-

the proceeds of that check to purchase materials and things to make the Property more livable again, after Initial Investments failed to properly restore the Property.  The record is silent as to precisely how the Debtor obtained a check from Hanover made payable solely to her, but what the record does show is that the Debtor did not appropriate or convert the Hanover Check to her own use: instead she sent it back to Hanover.

In contrast to embezzlement, larceny requires "that the original taking must have been unlawful, and is defined as 'the fraudulent and wrongful taking and carrying away of property of another with intent to convert such property to the taker's use without the consent of the owner.'" In re Noblit, 327 B.R. at 311 (quoting Graffice v. Grim (In re Grim), 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003)).

Once again, the evidence in this case shows that Initial Investments has now received the Seterus Proceeds and that the Debtor returned the Hanover Check to Hanover.  There is no evidence that the Debtor took or carried away any property of Initial Investments.  The Debtor undoubtedly breached the Work Authorization by not endorsing and turning over the Hanover Check and by refusing to sign the bottom of the Work Authorization upon Initial Investments completing the restoration services.  But there is no evidence to show that the Debtor committed larceny.

Initial Investments's claim for nondischargeability under § 523(a)(4) fails.

### Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity . . . ."  To prevail under § 523(a)(6), Initial Investments must prove that the Debtor acted both willfully and maliciously to injure Initial Investments or its property.  An act is willful only if the actor intends not only the act itself but also

-19-

the injury that results from the act, or believes that the injury is substantially certain to occur as a result of the act.  Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998); Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999).  "'Malicious' means in conscious disregard of one's duties or without just cause or excuse . . . ."  Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986) (citing in part  Tinker v. Colwell, 193 U.S. 473, 486 (1904)) (other citations omitted).

Initial Investments argues that the Debtor's conduct regarding the Hanover Proceeds and the Seterus Proceeds constitutes a willful and malicious injury.  Before considering whether the Debtor's conduct was willful and malicious, it is first necessary to determine whether the Debtor's conduct concerning the Hanover Proceeds and the Seterus Proceeds caused any injury at all.

At the time that Initial Investments filed the complaint in this adversary proceeding, it appears to have been under the impression that there was a check for the Hanover Proceeds and a check for the Seterus Proceeds.  As noted earlier, the evidence shows that there was only one check, the Hanover Check.  Because Initial Investments has now received the Seterus Proceeds in full, the Court finds that there was no injury to Initial Investments or its interest in the Seterus Proceeds.  At most, the Debtor's conduct caused a delay in Initial Investments receiving the Seterus Proceeds.  However, the analysis is different with respect to the Hanover Proceeds.  The Debtor's conduct prevented Initial Investments from ever receiving the Hanover Proceeds.  While the Debtor and Initial Investments quarreled at trial over the nature and scope of Initial Investments' property interest in the Hanover Proceeds, the Court need not address that issue because § 523(a)(6) requires only that there be an injury to another entity or to the property of another entity.  The evidence proves that the Debtor's conduct caused an injury regarding the Hanover Proceeds.  That is

sufficient for purposes of § 523(a)(6) regardless of whether the Court views the injury regarding the Hanover Proceeds to be an injury suffered by Initial Investments or an injury to its property.

The evidence also shows that the Debtor's conduct that caused the injury regarding the Hanover Proceeds was willful. The Debtor's own testimony demonstrates that she deliberately refused to endorse and deliver the Hanover Check when she first received it in December, 2012. The evidence leaves no doubt that the Debtor knew that her conduct in refusing to endorse the Hanover Check and instead returning the Hanover Check to Hanover, and causing Hanover to reissue a check in her name only, was substantially certain to injure Initial Investments or its interest in the Hanover Proceeds because Initial Investments would be deprived of those proceeds.

The more difficult issue is whether the Debtor's conduct regarding the Hanover Proceeds was malicious. In other words, was the Debtor's conduct in conscious disregard of her duties or without just cause? Initially, the Debtor endorsed and turned over to Initial Investments four separate checks that she received from insurance – three issued by Seterus, and one issued by Hanover. These four insurance checks were issued at the start of the restoration work and as the work progressed. The evidence shows that it wasn't until later, as the work neared completion, that the Debtor had become dissatisfied with Initial Investments' work. As a result, she decided not to endorse and deliver the Hanover Check to Initial Investments but instead to return it to Hanover and ask that another check be issued solely to her. The Debtor's express reason for not endorsing and delivering the Hanover Check in December, 2012, was because, by that time, the Debtor did not believe that Initial Investments had performed the restoration services in compliance with the Work Authorization. In other words, it wasn't owed any more money. The Debtor was adamant in her

-21-

belief that Initial Investments should not be paid for its work, even with funds from her insurance carrier.

These facts do not prove that the Debtor had a conscious disregard for her duties. She believed that she was under a duty to endorse and deliver insurance checks if the work was done properly and the money was owed, but not when the work was not properly performed. Rather than a disregard of her duty, the record shows that the Debtor complied with her duty when she believed that money was owed, but not otherwise. Stated another way, the Debtor's belief that the money was not owed by her in December, 2012 provided her with a justification, or excuse, for not endorsing and turning over the Hanover Check to Initial Investments. The Court has now found that there was no factual basis for this belief, and that the Debtor's conduct was in breach of the Work Authorization. However, the evidence does not prove that the Debtor's breach was the result of a conscious disregard of her duties.

Initial Investments's claim for nondischargeability under § 523(a)(6) fails.

<u>The Settlement Agreement</u>

In the joint final pretrial statement and at the trial, Initial Investments requested that the Court award it sanctions and attorney fees incurred because of the Debtor's conduct in connection with the Settlement Agreement. Although Initial Investments did not cite any legal authority to support its request, the Court has an inherent power to award sanctions and attorney fees under <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991), as applied to bankruptcy courts by the Sixth Circuit in <u>Grossman v. Wehrle</u> (<u>In re Royal Manor Mgmt, Inc.</u>), 652 Fed. Appx. 330, 342 (6th Cir. 2016) and <u>Mapother & Mapother, P.S.C. v. Cooper</u> (<u>In re Downs</u>), 103 F.3d 472, 477 (6th Cir. 1996). This inherent power gives the Court authority to sanction improper conduct and bad faith

in order to "'protect the orderly administration of justice and to maintain the authority and dignity of the court . . . .'" John Richards Homes Building Co., L.L.C. v. Adell (In re John Richards Homes Building Co., L.L.C.), 404 B.R. 220, 226 (E.D. Mich. 2012) (quoting Mitan v. Int'l Fid. Ins. Co., 23 Fed. Appx. 292, 298 (6th Cir. 2001)). "In addition to the inherent authority to issue sanctions as explained in Chambers, 11 U.S.C. § 105(a) grants to federal bankruptcy courts the authority to issue sanctions." Id. at 227.

Initial Investments is justifiably angry about the time and the money that was wasted in this case by the Debtor entering into the Settlement Agreement with Initial Investments. The Debtor's testimony unequivocally demonstrates that when the Debtor entered the Settlement Agreement on October 15, 2015, she knew that the terms of the Settlement Agreement were impossible to perform. The Debtor testified that she received the Hanover Check in late December, 2012, returned it to Hanover and procured from Hanover on April 24, 2013, another check in the identical amount made payable solely to her. Simply put, the Debtor knew there were no longer any Hanover Proceeds when she signed the Settlement Agreement. The Debtor had an affirmative obligation to inform Initial Investments and the Court of this fact, yet she failed to do so. The Debtor's conduct resulted in a six month wild goose chase for Initial Investments. The Court finds that the Debtor acted improperly and in bad faith.

Initial Investments did not specify the amount of sanctions and attorney fees that it seeks. The only evidence at trial of the expenses incurred by Initial Investments because of the Debtor's conduct regarding the Settlement Agreement consists of the invoices (exhibit 55) sent to Initial Investments by its attorney, Howard & Howard. Those invoices include all services rendered by Howard & Howard to Initial Investments from January, 2013 through July, 2016. The vast majority

of the invoices relate to services performed pre-petition, including the Wayne County Lawsuit, and services performed post-petition in prosecuting this adversary proceeding. Those services were not necessitated by the Settlement Agreement, and would have been performed regardless of the Settlement Agreement. The only additional services described in those invoices that were caused by the Settlement Agreement consist of $328.00 in October, 2015, $968.00 in March, 2016, and $923.00 in April, 2016.[4]  Those services total $2,219.00.

The Court finds from the evidence that the Debtor should be sanctioned for her conduct regarding the Settlement Agreement. The Court further finds that a reasonable sanction in this case is the sum of $2,219.00. This sum will fully compensate Initial Investments for the additional, unnecessary attorney fees that it incurred because of the Debtor entering into the Settlement Agreement knowing that it could not be performed, and will put Initial Investments back in the position that it was in prior to the Settlement Agreement.

### Conclusion

The Court holds that the Debtor owes Initial Investments $19,067.97 for work performed by it under the Work Authorization. Further, the Court holds that the Work Authorization entitles Initial Investments to recover interest and attorney fees on this debt. Initial Investments proved that the Debtor breached her contract with Initial Investments. However, Initial Investments failed to meet its burden to prove that the debt that arose from this breach of contract is excepted from discharge under § 523(a)(4) or (6) of the Bankruptcy Code.

---

[4] The specific time entries are October 19, 2015 (0.5 hours); October 20, 2015 (0.3 hours); March 7, 2016 (2.0 hours); March 11, 2016 (0.1 hours); March 22, 2016 (0.1 hours); and April 11, 2016 (2.3 hours).

The Court further holds that Initial Investments is entitled to a sanction against the Debtor in the amount of $2,219.00 because of the Debtor's misconduct regarding the Settlement Agreement. The Debtor's misconduct regarding the Settlement Agreement caused unnecessary delay and expense in the prosecution of this adversary proceeding, but that does not mean that the pre-petition debt owed by the Debtor to Initial Investments is excepted from the discharge in the Debtor's bankruptcy case.

The Court will enter an order consistent with this opinion.

.

Signed on December 12, 2016

                                    /s/ Phillip J. Shefferly
                                    Phillip J. Shefferly
                                    United States Bankruptcy Judge